1

2

3                                                    O

4

5

6

7

8              UNITED STATES DISTRICT COURT

9             CENTRAL DISTRICT OF CALIFORNIA

10

11  PAYAM AHDOOT, etc.,        )    Case Nos.
                               )    CV 13-02823-VAP (VBKx)
12            Plaintiffs,      )    **CV 13-07898-VAP (VBKx)**
                               )
13       v.                    )    **ORDER GRANTING MOTION FOR**
                               )    **FINAL APPROVAL OF CLASS**
14  BABOLAT VS NORTH           )    **ACTION SETTLEMENT (DOC. NO.**
    AMERICA, INC., etc.,       )    **62) AND GRANTING MOTION FOR**
15            Defendants,      )    **ATTORNEY FEES, COSTS,**
                               )    **INCENTIVE AWARDS, AND**
16                             )    **ADMINISTRATION COSTS (DOC.**
    BRANDON CLARK, etc.,       )    **NO. 63)**
17            Plaintiffs,      )
                               )    **[Motions filed on February**
18       v.                    )    **27, 2015 ]**
                               )
19  BABOLAT VS NORTH           )
    AMERICA, INC., etc.        )
20            Defendants.      )
    _____)

21

22

23       On February 27, 2015, Plaintiffs Payam Ahdoot

24  ("Ahdoot") and Brandon Clark ("Clark") (collectively,

25  "Plaintiffs") filed a "Motion for Final Approval of Class

26  Action Settlement" ("Approval Mot.") and a "Motion for

27  Attorney Fees, Costs, Incentive Awards, and Settlement

28  Administration Expenses" ("Fee Mot.").  (Doc. Nos. 62-

1  63.)  Plaintiffs seek final judicial approval of an
2  agreement to settle claims that Defendant Babolat VS
3  North America, Inc. ("Babolat"), used deceptive
4  advertising to sell tennis racquets; Babolat has filed a
5  Notice of Non-Opposition to Plaintiffs' motions.  (See
6  Doc. No. 67.)  The motions came before the Court for
7  hearing on April 6, 2015.  After consideration of the
8  papers filed in support of the motions, the Court GRANTS
9  the motions, and enters final approval of the settlement
10  between Plaintiffs and Babolat, and approves Class
11  Counsel's request for attorneys' fees and other
12  associated litigation costs.
13
14                    **I.  BACKGROUND**[1]
15  **A.  Plaintiffs' Allegations and Preliminary Approval of**
16  **the Settlement**
17       Ahdoot filed his action on April 22, 2013.[2]  (Doc.
18  No. 1.)  Ahdoot's action was consolidated with Clark's
19  action on December 19, 2013.  (Doc. No. 32.)  Plaintiffs
20  brought this putative class action against Babolat,
21  alleging it had engaged in false and misleading
22  advertising with respect to its AeroPro Drive tennis
23  _____

24       [1]   On December 2, 2014, this case was randomly
     reassigned to the docket of the undersigned from the
25  docket of the judge initially assigned to this case,
     Judge Gary A. Feess, pursuant to Order of the Chief Judge
26  14-083.  (Doc. No. 60.)

27       [2]   Ahdoot filed a similar action on January 11,
     2013, but dismissed it before Babolat answered the
28  complaint.  (Approval Mot. at 3.)

1  racquets ("AeroPro"), endorsed by Rafael Nadal ("Nadal"),

2  its Pure Drive tennis racquets ("Pure Drive"), endorsed

3  by Andy Roddick ("Roddick"), and a number of other

4  racquets associated with professional tennis players.

5  (Second Amended Complaint (Doc. No. 55) ¶¶ 4-11.)

6

7      Plaintiffs allege that Babolat misrepresented to

8  consumers that the racquets available for purchase by the

9  public were identical to those used on the professional

10  tennis tour by professional players when, in reality,

11  "[t]he racquets which many of the Babolat-sponsored pros

12  actually use are much different than [those racquets] and

13  [are] not available to the public." (Id. ¶ 4.)

14  Moreover, Plaintiffs aver that Babolat's use of the

15  phrase "Nadal's racquet of choice" is misleading and that

16  "[p]rior to major professional tennis tournaments,

17  Babolat paints and otherwise modifies these pros'

18  customized racquets so that they appear to be identical

19  to the ones sold in stores and on the internet." (Id.)

20  The SAC also describes what Plaintiffs characterize as a

21  "long-term and pervasive advertising campaign [by

22  Babolat] . . . designed to deceive consumers about the

23  racquets it sells." (Id. ¶ 5.)

24

25      Specifically, on or about January 15, 2011, Plaintiff

26  Ahdoot, believing he was purchasing the same AeroPro

27  racquet used by Nadal, purchased an AeroPro Drive racquet

28

for a total of $222.92 from Westwood Sporting Goods in
Los Angeles, California.  (Id. ¶ 30.)  In April 2012,
Plaintiff Clark, believing he was purchasing the same
Pure Drive racquet used by Roddick, purchased two Pure
Drive Roddick racquets for a total between $250 and $300.
(Id.)  Plaintiff Clark, believing he was then purchasing
the same AeroPro racquet used by Nadal, purchased two
AeroPro racquets directly from Babolat in May 2010 for
$254.  (Id.)

Plaintiffs allege that they have therefore "suffered
injury in fact and lost money by purchasing racquets they
otherwise would not have purchased" but for Babolat's
deceptive advertising.  (Id. ¶ 42.)  On this basis,
Plaintiffs assert claims against Babolat for: (1)
violation of California's Unfair Competition Law ("UCL"),
Cal. Bus. & Prof. Code § 17200; (2) violation of the
Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code
§ 17500; (3) breach of express warranty; (4) violation of
False Advertising Law ("FAL"), Cal Bus. & Prof. Code
§§ 17500 et seq.; (5) fraud; and (6) negligent
misrepresentation.  (See SAC.)

The parties reached an agreement on the terms of a
settlement of the class claims after discovery -- which
included an exchange of more than 30,000 documents and
multiple depositions of Babolat's employees -- and arm's

1   length negotiations with the assistance of a mediator.
2   (See Approval Mot. at 3-6.)  As a result, the partes
3   entered into a Stipulation and Agreement of Settlement.
4   (See Declaration of Christopher J. Hamner in Support of
5   Approval Mot. ("Hamner Decl.") (Doc. No. 62-2) at Ex. 1
6   ("Settlement Agmt.") (Doc. No. 62-3).)

7

8       In the motion for preliminary approval of class
9   settlement, the Plaintiffs sought and received the
10   following: (1) preliminary approval of the proposed class
11   settlement; (2) approval of the form and content of the
12   Short Form and Long Form Publication Notices,
13   substantially in their proposed forms; (3) certification
14   of the Class for settlement purposes; (4) the appointment
15   of Payam Ahdoot and Brandon Clark as Class
16   Representatives for the Class; (5) the appointment of
17   Hamner Law Offices, APC; the Olsen Law Offices, and
18   Wootton Law Group, LLP as Class Counsel for settlement
19   purposes; (6) leave for Plaintiffs to amend their
20   complaint; (7) enjoinment of Settlement Class Members
21   from commencing or continuing any action asserting any
22   claims encompassed by the Settlement Agreement unless the
23   Class Member submits a valid Request for Exclusions, with
24   the exception of Plaintiffs filing the Second Amended
25   Complaint, proceedings related to final approval of the
26   Settlement and consideration of Class Counsel's Fee and
27   Cost Application; (8) preliminary approval of
28

1  administration costs to be paid to the Settlement
2  Administrator; (9) an immediate stay of the Action, with
3  the exception of proceedings relating to the Settlement
4  Agreement; and (10) the scheduling of a final approval
5  hearing.  (Order Granting Preliminary Approval of Class
6  Action Settlement ("Approval Order") (Doc. No. 54) at 2.)
7  Judge Feess approved preliminarily the terms of the
8  Settlement Agreement on October 7, 2014.  The Approval
9  Order was modified twice to correct minor typographical
10 errors and omissions.  (See Doc. Nos. 56, 59.)
11
12 **B.  The Settlement Agreement**
13     The Settlement Agreement is the result of "extensive
14 discovery, including the production and review of tens of
15 thousands of pages of documents, many of which were in
16 French and required translation into English . . . taking
17 depositions of the parties, . . . [and] a day long
18 mediation in San Francisco with mediator Antonio Piazza."
19 (Approval Mot. at 6; Approval Order at 3.)  Class Counsel
20 "is convinced that the proposed Settlement is in the best
21 interests of the Class based on the negotiations and a
22 detailed knowledge of the issues present in this Action."
23 (Approval Mot. at 9; Approval Order at 3.)  "The length
24 and risks of trial and other normal perils of litigation
25 that may have impacted the value of the claims were all
26 weighed in reaching the proposed Settlement."  (Id.)  "In
27 addition, the uncertainty of class certification, the
28

1  difficulties of complex litigation, the lengthy process

2  of establishing specific damages and various possible

3  delays and appeals were also carefully considered by

4  Class Counsel in agreeing to the proposed Settlement."

5  (Id.)

6

7      **1.   The Settlement Class**

8      The Proposed Settlement encompasses a Settlement

9  Class defined as

10
11         all Persons who engaged in a Qualifying
           Transaction with the exception of employees,
12         principals, officers, directors, agents,
           affiliated entities, legal representatives,
13         successors, or assignees of Babolat VS North
           America, Inc.; distributors, dealers, and
14         retailers of Babolat VS North America, Inc. or
           its parent, Babolat VS SA, to the extent the
15         Qualifying Racquets were purchased by the
           distributors, dealers, and retailers for resale
16         and not for personal use; and the District Court
           and any other judges who may be assigned to the
17         Action and any members of their immediate
           families.

18  (Settlement Agmt. at 9, § EE.)  A Qualifying Transaction

19  is the "purchase of a Qualifying Racquet(s) for personal

20  use, and not for resale during the Class Period."  (Id.

21  at 8, § X.)  A Qualifying Racquet includes the following

22  Babolat tennis racquets:

23
           Pure Drive, Pure Drive +, Pure Drive 107, Pure
24         Drive Roddick, Pure Drive + Roddick, Pure Drive
           Roddick Junior, Pure Drive Lite, Pure Drive
25         French Open, Pure Drive Lite French Open, Pure
           Drive 260 French Open, Pure Drive Junior 26
26         French Open, Pure Drive Lite Pink, Pure Drive
           Wimbledon, Pure Drive Junior Wimbledon, Pure
27         Drive Play, AeroPro Drive, AeroPro Drive +,
           AeroPro Drive Junior, AeroPro Team, AeroPro

28

Lite, AeroPro Drive French Open, AeroPro Drive
Junior French Open, AeroPro Lite French Open,
AeroPro Team Wimbledon, Aero Storm, Aero Storm
Tour, Pure Storm, Pure Storm Limited, Pure Storm
Limited +, Pure Storm Tour, Pure Storm Tour +,
Pure Storm Team, Pure Control, Pure Control
Tour, Pure Control Tour +, Pure Control 95 and
Pure Control 95 +.

(Id. at 7-8, § W.)


The Class Period is defined as "the period beginning

on January 1, 2009, and ending on November 11, 2014, or,

if later, the actual date of publication of the

November/December issue of Tennis Magazine containing the

Short Form Publication Notice."  (Id. at 5, § G.)


**2.   The Terms of the Settlement**

Each Settlement Class Member who submits a Valid

Claim with a proof of purchase "will be entitled to a

reimbursement of fifty U.S. dollars ($50) for each adult

racquet and twenty five U.S. dollars ($25) for each

junior racquet for each Qualifying Transaction."

(Settlement Agmt. at 13, ¶ 2.)  Each Settlement Class

Member who does not have a proof of purchase but who can

provide the Qualifying Racquet's serial number will "be

entitled to a reimbursement of fifty U.S. dollars ($50)

for each adult racquet for each Qualifying Transaction .

. . up to a maximum of ten (10) Qualifying Racquets per

Person."  (Id. at 13-14, ¶ 2.)  All junior racquets and

some adult racquets do not have serial numbers and thus

do not qualify for such reimbursement.   (Id. at 14,

¶ 2.)   For junior racquets and adult racquets without a

serial number or proof of purchase, each "Settlement

Class Member who submits a Valid Claim will be entitled

to a reimbursement of twenty U.S. dollars ($20) for each

adult racquet and ten U.S. dollars ($10) for each junior

racquet obtained through a Qualifying Transaction up to a

maximum of three (3) Qualifying Racquets per Person."

(Id. at 14, ¶ 2.)


    The Settlement Agreement provides that Babolat will

establish a non-reversionary fund of $4,500,000[3]

including the following payments, subject to Court

approval: (1) attorneys' fees of $1,125,000, which is 25%

of the Gross Settlement Fund ("GSF"); (2) costs of up to

$150,000.00, of which Plaintiffs' counsel is requesting

$78,134.65; (3) incentive awards in the amount of $5,000

to each named Plaintiff in consideration for serving as

Class Representative; and (4) estimated Settlement

---

[3]    The parties also agreed that the Gross Fund
Value will be funded in installments: (1) the first
installment of $300,000; (2) additional deposits of
$200,000 per month for the following six months; and (3)
in the eight months from the approval and entry of the
Preliminary Approval Order, additional deposits as
necessary "to bring the total of deposits and accrued
interest to four million five hundred thousand U.S.
dollars ($4,500,000)."   (Settlement Agmt. at 11-12;
Approval Order at 5.)   These payments will be made to "an
escrow account with a reputable financial institution"
who will administer those funds "as approved by the
Parties and the Settlement Administrator."   (Settlement
Agmt. at 11; Approval Order at 5.)

1  Administration expenses of up to $133,000-$240,000, of
2  which Plaintiffs' counsel is requesting $194,524.78.
3  (Approval Order at 3; Approval Mot. at 6-7.)  After all
4  Court-approved deductions, the Net Settlement Fund[4] is
5  estimated to be $3,092,340.57.  (Approval Mot. at 7.)  If
6  the aggregate of all Valid Claims exceeds the Net
7  Settlement Fund, each reimbursement "will be adjusted
8  downward on a Qualifying Racquet *pro rata* basis."
9  (Settlement Agmt. at 14, ¶ 3.)   Should the Net Settlement
10 Fund exceed the amount of Valid Claims submitted,
11 remaining funds "shall be distributed *cy pres* as follows:
12 (a) fifty percent (50%) to St. Jude's Children's Research
13 Hospital . . . and (b) fifty percent (50%) to USTA
14 Serves."  (Id. at 14, ¶ 4.)   The parties have also agreed
15 to non-monetary benefits, including: (1) Babolat's
16 implementation of disclaimers in connection with
17 professional endorsements; (2) Babolat ceasing to
18 reference in any US advertisements that any of its
19 racquets contain tungsten; (3) Babolat ceasing to refer
20 to tungsten in "their advertising, marketing,
21 communications and labeling in the United States in
22 connection with 'GT Technology.'"  (Approval Mot. at 8-9;
23 Approval Order at 3.)
24
25 ───────────────────
     [4]     After deducting the payment of attorneys' fees,
26 costs, Class Representative incentive awards, and
     Settlement Administration expenses, the remaining Net
27 Settlement Fund shall be available to pay Valid Claims
     submitted by Class Members.  (Settlement Agmt. at 6-7, §
28 Q; Approval Order at 5.)

1        In exchange for the Settlement benefits, Settlement

2   Class members are deemed to have "fully, finally, and

3   forever released, relinquished and discharged each and

4   all of the Babolat Releasees from any and all of the

5   Class Representatives' and each and every Settlement

6   Class Member's . . . respective claims, actions, demands,

7   suits, and causes of action, whether class, individual or

8   otherwise in nature. . . ." (Settlement Agmt. at 23, §

9   B; Approval Order at 6-7.)  This release includes

> costs, expenses, penalties and attorneys' fees,
> known or unknown, suspected or unsuspected,
> direct or indirect, contingent or absolute,
> existing or potential, in contract or in tort,
> in law or equity, that the Class Representatives
> and each and every Settlement Class Member . . .
> ever had, now has, or hereafter can, will, or
> may have, arising out of (i) advertising,
> marketing and conduct of whatever kind by the
> Babolat Releasees related to any and all
> professional athletes and their connection with,
> affiliation with, association with or
> endorsement of the Qualifying Racquets and any
> components thereof; (ii) the use of the term "GT
> Technology" and "tungsten" in the Babolat
> Releasees' advertising, marketing materials,
> labeling, and any other communication or
> information of whatever kind related to the
> Qualifying Racquets, (iii) factual allegations
> or claims made in the Second Amended Complaint,
> and (iv) any violation or alleged violation of
> any federal or state law and any federal or
> state statute, including but not limited to
> California Business & Professions Code §§ 17200,
> et seq., 17500 et seq., and California Civil
> Code §1750, predicated on (i), (ii) or (iii)
> (the "Released Claims").

(Settlement Agmt. at 24.)

### 3.   The Settlement Administration and Notice

After preliminary approval, the settlement administrator was required to: (1) "provide copies of the Settlement Account's monthly statements to Class Counsel and Babolat's Counsel no later than the fifteenth (15th) day of each month" until the Final Effective Date of the Settlement; (2) examine and verify submitted claims; (3) administer the publication of the Short Form Publication Notice in Tennis Magazine; (4) administer the placement of the banner advertisement regarding the Settlement on Tennis.com; (5) administer the creation, operation, maintenance, and cessation of the Settlement website Babolatsettlement.com; (6) "prepare a declaration affirming compliance with the notice requirements," and provide such declaration "to Babolat's Counsel and Class Counsel no later than fourteen (14) days prior to the Final Approval Hearing;" (7) "prepare and deliver to Babolat's Counsel and Class Counsel a report stating the total number of Persons who submitted valid Requests for Exclusion from the Settlement Class and the names and contact information of such Persons as well as the quantity and type of the Qualifying Racquets each Person purchased;" (8) "provide periodic updates to Class Counsel and Babolat's Counsel regarding Claim Form submissions" no later than one week after the Claims Period begins and at least once monthly thereafter; and (9) provide to Babolat or other Person as Babolat may

1  direct an electronically searchable alphabetical list of
2  the Settlement Class Members who were paid out of the Net
3  Settlement Fund, their contact information, and the
4  amount paid to them. (Settlement Agmt. at 12, 14, 16-17.)
5  The Settlement website was required to be operational on
6  or before the first day on the Short Form Publication
7  Notice appears in Tennis Magazine. (Id. at 15.)
8
9      Members of the Settlement Class may opt out of the
10  settlement by submitting a written request postmarked no
11  later than twenty-one days before the Final Approval
12  Hearing to the Settlement Administrator to be excluded
13  from the class. (Id. at 8, § Z.)  This letter must
14  contain: (1) the Class Member's name, current mailing
15  address, and telephone number; (2) the racquet(s) the
16  Class Member purchased, the approximate dates of such
17  purchase(s), and location of such purchase(s); (3) the
18  statement "I want to be excluded from the proposed Class
19  Action Settlement in the Babolat lawsuit;" and (4) the
20  Class Member's signature.  (Approval Order at 6.)
21
22      The Short Form Publication Notice, Long Form
23  Publication Notice, and banner advertisement containing a
24  link to the Settlement website, Babolatsettlement.com, on
25  the United States version of websites Babolat.com and
26  Tennis.com proposed by the Parties will provide
27  Settlement Class members with appropriate information
28

about: (1) the nature of the action; (2) the class
definition; (3) a description of the claims at issue; (4)
a summary of the proposed settlement terms; (5) a
description of the settlement formula and distribution
including Plaintiff's enhancement award and Class
Counsel's attorney's fee award and costs, the terms of
the release; and (6) the right of Settlement Class
members to be excluded from the class or to object to the
Settlement Agreement and the procedures for doing so.
(Id.) The Settlement website, Babolatsettlement.com shall
contain: (1) the Short Form Publication notice; (2) the
Long Form Publication Notice; (3) the Claim Form; (4) the
Settlement Agreement, without exhibits; (5) the Second
Amended Complaint; and (6) the Preliminary Approval
Order. (Settlement Agmt. at 16, § A.)  The Long Form
Publication Notice and the Settlement website also
include contact information for the Settlement
Administrator and Class Counsel.  (Approval order at 6;
Settlement Agmt. at 16, § A.)


## II. LEGAL STANDARD

Under Rule 23(e) of the Federal Rules of Civil
Procedure, "claims, issues, or defenses of a certified
class may be settled, voluntarily dismissed, or
compromised only with the court's approval."  Fed. R.
Civ. P. 23(e).  A court must engage in a two-step process
to approve a proposed class action settlement. First, the

court must determine whether the proposed settlement
deserves preliminary approval. <u>Nat'l Rural Telecomms.</u>
<u>Coop. v. DirecTV, Inc.</u>, 221 F.R.D. 523, 525 (C.D. Cal.
2004). Second, after notice is given to class members,
the Court must determine whether final approval is
warranted. <u>Id.</u> A court should approve a settlement
pursuant to Rule 23(e) only if the settlement "is
fundamentally fair, adequate and reasonable." <u>Torrisi v.</u>
<u>Tucson Elec. Power Co.</u>, 8 F.3d 1370, 1375 (9th Cir. 1993)
(internal quotation marks omitted); <u>accord In re Mego</u>
<u>Fin. Corp. Sec. Litig.</u>, 213 F.3d 454, 458 (9th Cir. 2000)
(citing <u>Hanlon v. Chrysler Corp.</u>, 150 F.3d 1011, 1026
(9th Cir. 1998)).

Circuit law teaches that the court must balance the
following factors to determine whether a class action
settlement is fair, adequate, and reasonable:

(1) the strength of the plaintiff's case;
(2) the risk, expense, complexity, and likely
duration of further litigation;
(3) the risk of maintaining class action status
throughout the trial;
(4) the amount offered in settlement;
(5) the extent of discovery completed and the
stage of the proceedings;
(6) the experience and views of counsel;

1    (7) the presence of a governmental participant;

2    and

3    (8) the reaction of the class members to the

4    proposed settlement.

5

6  Torrisi, 8 F.3d at 1375; accord Linney v. Cellular Alaska

7  Partnership, 151 F.3d 1234, 1242 (9th Cir. 1998); Hanlon,

8  150 F.3d at 1026. "In addition, the settlement may not be

9  the product of collusion among the negotiating parties."

10  In re Mego Fin. Corp. Sec. Litig., 213 F.3d at 458.

11  These factors are not exclusive, and one factor may

12  deserve more weight than the others depending on the

13  circumstances.  Torrisi, 8 F.3d at 1376. In some

14  instances, "one factor alone may prove determinative in

15  finding sufficient grounds for court approval."  Nat'l

16  Rural Telecomms. Coop., 221 F.R.D. at 525-26 (citing

17  Torrisi, 8 F.3d at 1376). In addition, "[t]he involvement

18  of experienced class action counsel and the fact that the

19  settlement agreement was reached in arm's length

20  negotiations, after relevant discovery had taken place

21  create a presumption that the agreement is fair."  Linney

22  v. Cellular Alaska Partnership, 1997 WL 450064, *5 (N.D.

23  Cal. July 18, 1997), aff'd, 151 F.3d at 1234.

24

25

26

27

28

# III. DISCUSSION

**A.   Final Approval of the Settlement**

**1.   Approval of the Settlement Terms**

As discussed below, the <u>Torrisi</u> factors favor final approval of the settlement.

### a.   Strength of Plaintiffs' Case

According to Plaintiffs' counsel, "Plaintiffs strongly believe that the Class claims are legally meritorious and present more than a reasonable probability of a favorable determination on behalf of the Class." (Approval Mot. at 14.)  Each member of the class will receive a 25%-34% refund of the purchase price paid for each racquet, provided they can provide a proof of purchase.  (<u>Id.</u> at 1-2.)  Should a class member not have a proof of purchase, he or she can still receive a refund.  (<u>Id.</u> at 2.)  As a result of the settlement, Babolat has changed its advertising and business practices.  All of this suggests that Plaintiffs' case had merit.  Thus, this factor weighs in favor of approval.

### b.   The Risk, Expense, Complexity, and Likely Duration of Further Litigation

Plaintiffs' counsel notes that there are always inherent risks associated with prosecuting a matter through trial, and this case is no exception.  (Approval

Mot. at 15.)  "While Babolat has agreed to settle the action, if this case were to proceed, Babolat would undoubtedly continue to assert a vigorous defense on liability."  (<u>Id.</u> at 16.)  In addition, even if Plaintiffs were able to succeed at trial, the burden of proving damages would remain; there is no guarantee that members of the Class would receive more than the Settlement Agreement provides if this case went to trial. (<u>Id.</u>)  As further litigation would undoubtedly be expensive and complex, and because there are significant risks to members of the class regarding their ability to succeed on the merits or to prove damages, this factor weighs in favor of approval.  (<u>Id.</u> at 16-17.)

### c.  The Risk of Maintaining Class Action Status Throughout the Trial

The Court may revisit the certification of the class at any time before entry of final judgment.  <u>See</u> Fed. R. Civ. P. 23(c)(1)(C).  Where there is a risk that class certification might not be maintained before entry of final judgment, this factor favors approving the proposed settlement.

Class Counsel contends that class certification is difficult to obtain in false advertising cases.  (<u>Id.</u> at 14-15.)  Recently, a judge of this district denied a motion for class certification in a factually similar

case concerning a professional tennis player's use of a similar racquet for sale to the public.  (See id. at 15 (citing Kramer v. Wilson, case no. 2:13-cv-06330-JFW-SH).)  Class certification was denied in that case because the court found the plaintiff failed to meet his burden of demonstrating that questions of fact and law common to all class members predominated over questions affecting only individual class members.  (Id.)  Though counsel maintain that the instant case is factually distinguishable, there nevertheless is the risk that continued class certification presents a risk to Plaintiffs.  (Id.)

Moreover, Babolat only assented to the Settlement Agreement with the assumption that it would be approved; should the Court not approve the settlement, Babolat has the right to terminate the agreement.  (Settlement Agmt. at 20, § D.)  In addition, should the Court not approve the settlement, the "Settlement Agreement [cannot] be offered, or received into evidence in any matter" other than for purposes of approval.  (Id. at 27-28, § IX.)

Given the uncertainty regarding Plaintiffs' ability to maintain class certification throughout the case, this factor also favors approving the proposed settlement.

### d.   The Amount Offered in Settlement

As noted above, the Settlement Agreement requires Babolat to create a settlement fund of $4.5 million.  The agreement was "negotiated after extensive discovery and an all day mediation" and it "resulted in substantial monetary benefits and significant changes to Babolat's advertising." (Approval Mot. at 19.)  "The Class Recovery is significant in that it contemplates reimbursement in the range of 25%-34% of the purchase price with respect to the racquets at issue.  The settlement not only falls within the range of possible judicial approval, but represents an excellent recovery on behalf of the Class." (Hamner Decl. at ¶ 7.) Given the risks and uncertainty attendant to this litigation as previously discussed, the Court finds that the amount of recovery each class member may recover weighs in favor of the Settlement Agreement's overall reasonableness.

### e.   The Extent of Discovery Completed and the Stage of the Proceedings

Throughout the course of litigation, "[v]oluminous written discovery has been propounded, reviewed and responded to by the Parties.  Babolat produced, and Plaintiffs' Counsel reviewed over 30,000 pages of documents, many of which were in French and required translation into English." (Approval Mot. at 4, 18.)

1   Moreover, numerous Babolat representatives were deposed
2   and product inspections were conducted.  (Id. at 4, 18.)
3   The record is clear that significant discovery was
4   undertaken by both parties.  As Class Counsel had
5   "sufficient information to make an informed decision
6   about settlement," this factor weighs in favor of
7   approval.  See Linney, 151 F.3d at 1239.
8
9           f.   The Experience and Views of Counsel
10       As noted above, Class Counsel contends that the
11  Settlement Agreement "not only falls within the range of
12  possible judicial approval, but represents an excellent
13  recovery on behalf of the class."  (Hamner Decl. at ¶ 7.)
14  Class Counsel have significant experience litigating
15  class action cases.  (Id. at ¶¶ 18-19.)  Counsel's
16  experience litigating class action cases, along with
17  their view that the Settlement Agreement presents a
18  significant recovery for the Plaintiffs', persuades the
19  Court that the Settlement Agreement is fair, reasonable,
20  and adequate in this case.  This weighs in favor of
21  approval.
22
23           g.   The Reaction of the Class Members to the
24                Proposed Settlement
25       According to Class Counsel, "[a]s of February 24,
26  2014, 17,203 Class Members filed valid claim forms, and
27  not a single Class Member objected to the settlement or
28

requested to be excluded."  (Approval Mot. at 21 (bolding omitted).)   The lack of any objection whatsoever by Class Members to the Settlement Agreement weighs in favor of approval.

### h.   Whether the Settlement Was a Product of Non-Collusive Bargaining

Finally, as noted above, the Settlement Agreement was reached with the assistance of a mediator.  (Approval Mot. at 5.)   Settlements reached with the help of a mediator are likely non-collusive.  Satchell v. Fed. Express Corp., 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007) ("The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive.").   The parties have presented no reason to find that the Settlement Agreement was anything other than the product of arm's-length negotiations. Accordingly, the Court finds this factor weighs in favor of approval.

As all of the above factors weigh in favor of final approval, the Court finds the Settlement Agreement to be fair, reasonable, and adequate.

### 2.   Approval of the Notice Procedures

Rule 23 requires the court to direct to Class Members "the best notice that is practicable under the

circumstances, including individual notice to all members
who can be identified through reasonable effort."  Fed.
R. Civ. P. 23(c)(2)(B).  In addition, Rule 23(e)(1)
requires the court to "direct notice in a reasonable
manner to all class members who would be bound by the
proposal."  The notice must explain in easily understood
language the nature of the action, definition of the
class, class claims, issues and defenses, ability to
appear through individual counsel, procedure to request
exclusion, and binding nature of a class judgment.  Fed.
R. Civ. P. 23(c)(2)(B).  Plaintiff must provide notice to
potential opt-in class members that is "timely, accurate,
and informative."  See Hoffmann-La Rouche Inc. v.
Sperling, 493 U.S. 165, 172 (1989).  Likewise, claim
forms must be informative and accurate.  Id. at 172;
Churchill Village, L.L.C. v. Gen. Elec., 361 F.3d 566,
575 (9th Cir. 2004) (notice is satisfactory if it
"generally describes the terms of the settlement in
sufficient detail to alert those with adverse viewpoints
to investigate and to come forward and be heard").


    The Court previously found that "the proposed Class
Notice complies with Rule 23's requirements and should
therefore be certified for purposes of the Proposed
Settlement."  (Approval Order at 13.)  The Court now
evaluates whether the parties executed class notice in
accordance with the Court's Preliminary Approval Order.

1    According to Class Counsel, the Notice was
2    disseminated in conformity with the Court's Preliminary
3    Approval Order. (<u>See</u> Approval Mot. at 9-11 (citations
4    omitted).) Given Class Counsel's representation that the
5    Notice was disseminated in accordance with the Court's
6    previous order and the number of Class Members who have
7    responded to the Notice, the Court finds that the Notice
8    was reasonable as to its content and the method of
9    communication.

10

11   As the terms of the Settlement Agreement were fair,
12   reasonable, and adequate, and because the procedures for
13   dissemination of the Class Notice were the reasonable,
14   the Court finds that the Settlement Agreement should be
15   approved.

16

17   **B.   Approval of the Attorneys' Fees Awards, Costs,**
18   **Incentive Awards and Settlement Administrative**
19   **Expenses**

20   The Approval Order approved allocation of settlement
21   funds for attorneys' fees, costs, incentive award
22   payments, and settlement administrative expenses. As
23   noted above, Class Counsel filed a separate motion (the
24   Fee Mot.) requesting final approval of these
25   expenditures. The Court addresses each in turn. <u>Staton</u>
26   <u>v. Boeing Co.</u>, 327 F.3d 938, 963 (9th Cir. 2003) ("[T]o
27   avoid abdicating its responsibility to review the

28

agreement for the protection of the class, a district
court must carefully assess the reasonableness of a fee
amount spelled out in a class action settlement
agreement.").

### 1.  Attorneys' Fees

The Settlement Agreement sets aside $1.125 million,
or 25% of the settlement proceeds as attorneys' fees.
(Fee Mot. at 1;  Settlement Agreement at 21, § B.)  To
calculate the reasonableness of an award of attorney's
fees, the Court may use either the percentage-of-the-fund
method[5] or the lodestar/multiplier method.[6]  In re
Washington Pub. Power Supply Sys. Sec. Litig., 19 F.3d
1291, 1295 (9th Cir. 1994) ("[T]he district court has
discretion to use either method in common fund cases.").
Regardless of the method used, "the district court should
be guided by the fundamental principle that fee awards
out of common funds be "reasonable under the
circumstances."  In re Washington Pub. Power Supply Sys.

_____

[5]     Under the percentage-of-the-fund method, the
court calculates the fee award by designating a
percentage of the total common fund.  Six Mexican Workers
v. Ariz. Citrus Growers, 904 F.2d 1301, 1311 (9th Cir.
1990).

[6]     Under the lodestar method, the court calculates
the fee award by multiplying the number of hours
reasonably spent by a reasonable hourly rate and then
enhancing that figure, if necessary to account for the
risks associated with representation.  Paul, Johnson,
Alston & Hunt v. Graulty, 886 F.2d 268, 272 (9th Cir.
1989).

Sec. Litig., 19 F.3d at 1296 (quoting State of Florida v.
Dunne, 915 F.2d 542, 545 (9th Cir. 1990)).

Twenty-five percent, the amount requested by
Plaintiffs' counsel here, is the "'benchmark' award that
should be given in common fund cases." Six Mexican
Workers, 904 F.2d at 1311.  "The benchmark percentage
should be adjusted, or replaced by a lodestar
calculation, when special circumstances indicate that the
percentage recovery would be either too small or too
large in light of the hours devoted to the case or other
relevant factors."  Id.

The Court elects to use the percentage-of-the-fund
method to determine if the proposed attorney's fees are
reasonable.  As Class Counsel agree that 25% is
reasonable here, and there is no evidence that an award
of 25% would be a windfall to Plaintiffs' counsel (see
Fischel v. Equitable Life Assur. Soc'y of U.S., 307 F.3d
997, 1007 (9th Cir. 2002)), the Court agrees that the
Settlement Agreement's attorneys' fees request is
reasonable.

Moreover, assuming the Court used the lodestar
method, a review of the billing records submitted by
Class Counsel (see Fee Mot. at 11; Declaration of
Christopher J. Hamner in Support of Fee Mot. (Doc. No.

63-2) at Ex. 3 (Doc. No. 63-5); Declaration of Chad B. Wootton in Support of Fee Mot. (Doc. No. 63-7) at Ex. 5 (Doc. No. 63-8); Declaration of Christopher A. Olsen in Support of Fee Mot. (Doc. No. 63-9) and its attachment (Doc. No. 63-10)), shows that the fees as calculated by the lodestar approach would also be reasonable.

### 2.   Costs

The Approval Order approved up to $150,000.00 in actual litigation costs.  (Approval Order at 2, 4.)  Rule 23(h) provides that the Court may award reasonable costs. Fed. R. Civ. P. 23(h).  Class Counsel has provided an accounting for its costs, which total $78,134.65.  (Fee Mot. at 1; Declaration of Christopher J. Hamner in Support of Fee Mot. at Ex. 4)  The Court finds these costs to be reasonable.

### 3.   Incentive Awards

"[N]amed plaintiffs, as opposed to designated class members who are not named plaintiffs, are eligible for reasonable incentive payments." <u>Staton</u>, 327 F.3d at 977. Factors the court should consider when assessing whether individual incentive payments are reasonable include: (1) the actions the plaintiff has taken to protect the interests of the class; (2) the degree to which the class has benefitted from those actions; (3) the amount of time and effort the plaintiff expended in pursuing the

litigation; and (4) and reasonable fears of workplace
retaliation.  Id.  Courts may also consider: the risk to
the class representative in commencing suit, both
financial and otherwise; the notoriety and personal
difficulties encountered by the class representative; the
amount of time and effort spent by the class
representative; the duration of the litigation; and the
personal benefit (or lack thereof) enjoyed by the class
representative as a result of the litigation.  Van
Vranken v. Atl. Richfield Co., 901 F. Supp. 294, 299
(N.D. Cal. 1995).  "Courts have generally found that
$5,000 incentive payments are reasonable."  Alberto v.
GMRI, Inc., 252 F.R.D. 652, 669 (E.D. Cal. 2008).


The Court approved preliminarily an incentive award
of $5,000 for Ahdoot and Clark as named Plaintiffs.
(Approval Order at 7-8.)  The Court stated "that the
named Plaintiffs should be recognized and compensated for
their assistance and involvement throughout the
litigation, and that a $5,000 incentive award for each
named Plaintiff is appropriate."  (Id. at 16.)  Along
with the Fee Mot., Ahdoot and Clark submitted
declarations explaining the work they have done in this
case from its inception to the parties' assent to the
Settlement Agreement.  (See Declaration of Payam Ahdoot
in Support of Fee Mot. (Doc. No. 63-12); Declaration of
Brandon Clark in Support of Fee Mot. (Doc. No. 63-13).)

1  The Court agrees that a $5,000 incentive payment to each
2  named Plaintiff is reasonable.

3

4  **4.    Settlement Administration Costs**

5      The Court previously approved of the appointment of
6  Rust Consulting, Inc., to serve as the Settlement
7  Administrator.  (Approval Order at 17.)  Expenses in the
8  range of $113,219 to $218,757 were approved, as 50,000 to
9  150,000 claimants were expected.  (<u>Id.</u>)  According to
10 Class Counsel, the amount invoiced to date is $104,941.78
11 and it is estimated that an additional $89,583.00 will be
12 invoiced to complete the administration of the
13 Settlement, for a total of $194,524.78.[7]  (Fee Mot. at
14 24.)  As these costs are within the approved range, and
15 an explanation of the costs is supported by a declaration
16 from a Rust Consulting Employee (<u>see</u> Declaration of Tore
17 Hodne in Support of Fee Mot. (Doc. No. 63-11)), the Court
18 approves of the stated Settlement Administrator costs.

19

20     As all the fees and costs as noted in the Fee Mot.
21 are fair, reasonable, and supported by the supplied
22 evidence, the Court GRANTS the Fee Mot.

23

24

25 _____

26     [7]    Class Counsel filed a Notice of Errata
   explaining that the initial amount requested in the
27 motions for settlement administration costs was in error,
   and that the correct amount was $194.524.78.  (<u>See</u> Doc.
28 No. 65.)

**IV. CONCLUSION**

For the reasons stated above, the COURT APPROVES the settlement terms and GRANTS the Motion for Final Approval of Class Action Settlement.  Moreover, the Court GRANTS the Motion for Attorney Fees, Costs, Incentive Awards, and Settlement Administration Costs.

**IT IS SO ORDERED.**

Dated: April 6, 2015_____          _____
                                        VIRGINIA A. PHILLIPS
                                    United States District Judge